The U.S. Supreme Court in Miller L. said that while it's true that peremptory challenges are often the subject of instinct, and it can sometimes be hard to say what the reasons are, when the issue of race comes up, as the Batson challenge brought that issue of race up in this case, the U.S. Supreme Court said, A prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. In this case, the prosecutor's reasons that he stated were never put to the test. The state courts didn't focus on the reasons the prosecutor stated, the district court didn't focus on those reasons, and the attorney general in her brief doesn't focus on the reasons the prosecutor stated. Instead, every court that's looked at this issue has substituted reasons for reasons, oh, well, maybe he did it for this, or it's plausible that he excused the juror because of this. That is not the proper analysis. As the Supreme Court has said again and again in Miller L. and in Johnson in 2005, the proper analysis is to focus on what the prosecutor said in this case. And when we do that, and when we do the comparative analysis that the Supreme Court and this court sitting en banc has recognized as the appropriate analysis, we have met our burden of showing that the prosecutor in this case dismissed two African-American jurors based on pretext. Because when we compare the reasons stated for dismissing Henderson and Cambridge, and we compare those to other jurors who the prosecutor did not kick, the reasons just don't stand up. But, counsel, this is a habeas case, right? So we're applying we have to review the last recent decision of the state courts and determine whether it was objectively reasonable or an unreasonable determination of the facts in law. And the last court, recent state court decision, says that Watkins presents no facts showing the prosecution engaged in discriminatory conduct in the jury selection process. He has not made a prima facie showing of racial discrimination. It notes that one juror who was actually sat, seated, was African-American. How is that a violation of AEDPA? There are many reasons AEDPA was violated. First, the state court and the district court conflated the Batson three-part analysis and pushed it all into the prima facie analysis. So they all got it wrong. Batson says that for a prima facie case, and when the court looks at the report and recommendation in this case and the district court's order, it's completely wrong because they say for prima facie you need three things, and that is demonstrably false. The Supreme Court has said that for prima facie all you need, and I cite to Johnson in my brief, is for the defense attorney to say, you've kicked some jurors who are African-American. My client is African-American. Therefore, we've raised the issue of race. And in this case, the defense attorney actually waited until two jurors in a row were kicked who were both African-American and said, now I have a pattern. So we have even more than we need for prima facie. So that's the first area where the state courts under 2254D got it wrong. So it's contrary to clearly established United States Supreme Court law. It's also contrary to clearly established United States Supreme Court law because they didn't do a comparative analysis. So when they say didn't make a prima facie case, that's wrong. And when the attorney general says that we should defer to their findings, there are no findings. There are no findings because, number one, the trial judge never made it to step three of the analysis, and it's only at step three that we look to whether or not the defense has met the burden of showing a race-based kick. We never, ever made it to that step because the judge said there was no prima facie case, even though the prosecutor stated the reasons, which makes the whole issue moot. But once the prosecutor states his reasons for kicking the jurors, the court has a duty to analyze those stated reasons and to determine whether they're pretext. So that's why no deference applies here, that there are no factual findings in this case because step three of the analysis was never undertaken, and the State court never did a comparative analysis. And since they didn't do a comparative analysis, there are no factual findings. So not only did the procedure that they follow violate 2254d-1, so it was contrary to clearly established United States Supreme Court law, but it was also an unreasonable determination of the facts in light of the evidence presented. You know, I've got the following problem with what the Court of Appeal did, but I'm not sure I can do anything about it. As I'm sure you know, under Wheeler, the California courts had a different definition of prima facie case of discrimination than a Batson-type case. And in Johnson, the Supreme Court finally gets around to saying, you know, the Batson standard for a prima facie case is much easier to satisfy than the Wheeler standard for a prima facie case. Johnson has decided, I think, in 2005. The Court of Appeal here decides the case in 2006, and it doesn't cite Wheeler, it doesn't cite Johnson, it doesn't tell us anything about what it's relying on. My guess is that it's applying the old Wheeler standard, but it doesn't say so. What am I supposed to do with that? It's very frustrating that the California courts don't often follow United States Supreme Court law. And here we have clearly established United States Supreme Court law. And Johnson is just stating, didn't change Batson, it just clarified what Batson always meant. Well, what Johnson did was to say that the California courts, in applying Wheeler, were not following Batson. Correct. And the definition, the definitional difficulty is between Wheeler and Batson was that under Wheeler, the California state case, it was much harder to establish a prima facie case. Batson makes it much easier to establish a prima facie case. And then Johnson, the Supreme Court says these are not the same thing, and California is required to follow Batson rather than Wheeler. Right. And the California courts were always required to follow Batson, though. So Wheeler, to the extent that Wheeler is inconsistent with Batson. But prior to the Supreme Court's decision in Johnson, the California courts always quoted the Wheeler test and always followed the Wheeler test as if it complied with Batson. And they were wrong. And they were wrong. Right. And here we are one year after the Johnson case, one year after the Supreme Court has told the California courts the Wheeler test isn't right for prima facie. And I have a very strong suspicion that the court of appeal in 2006 has not actually abandoned Wheeler. But it doesn't cite Wheeler. It doesn't cite Johnson. It doesn't cite Batson. It doesn't cite anything. What am I supposed to do with that? Well, it's not a reasoned opinion. It's contrary to clearly established law. So the court should find that the last reasoned opinion is contrary to clearly established law. I understand the tension there in that maybe the trial judge was erroneously following Wheeler, understandably, and that the court of appeals certainly should be up on United States Supreme Court law. Well, what I'm worried about, because I confess this case bothers me, but what I'm worried about is that I think I'm supposed to assume that the court of appeal understands the law and follows it and is not required to tell me the law that it's following. Yeah. I see I only have one minute left, so I would like to reserve my time. All right. Thank you. May it please the Court. Megan Beale, Deputy Attorney General, on behalf of Appellee Warden. Your Honors, if I could first address Judge Fletcher's comment there. I think Early v. Packer tells us that it doesn't, that this court of appeal does not have to state the law that it is following. And I think as even Counsel for Appellant said, I think we need to assume and believe that the California courts of appeal do follow the highest law of the land, Johnson v. California, and that when this opinion was written in 2006, they were following Johnson v. California. And I don't think it would be appropriate, especially under AEDPA, to reverse a case based on a suspicion that the State court of appeal was following an incorrect law. I think AEDPA requires us to show more than that. AEDPA requires us, AEDPA and Early v. Packer. Okay. But what do we do with the following? Under Batson law, we pretermit the prima facie case question if the prosecutor announces his reasons. We're no longer looking at prima facie. We're looking at the reasons. And the court of appeal says there's no prima facie case. Well, that's wrong under Batson, even if they're following Johnson and Batson. It's wrong. The court of appeal isn't, the question in front of the court of appeal is not whether there's a prima facie case. The question in front of the court of appeal is, was this pretext? And they didn't answer that question. Well, by saying that there's no prima facie case of racial discrimination, I do think by necessity you show that there is no actual case of racial discrimination. But the rule under Batson is if the prosecutor, without awaiting a ruling by the court as to whether there's a prima facie case, if the prosecutor says here are my reasons, the question of prima facie case drops out. Correct. And the only issue is the pretext question. Right. The court of appeal does not answer the pretext question. Well, I think when they say that there's no showing of racial discrimination, I think that answers it. I think you can't have a prima facie showing unless there's a, I mean, a prima facie showing is a much easier standard to meet. And if you can't even meet the easier standard, there's no way you could meet the pretext standard. No, but the problem is, this is, I don't know if I'm having the exact same problem that Judge Butcher is, but if you actually read the trial court transcript, a prima facie case was made, and then the prosecutor came back with his reasons. And the question is whether there was adequate scrutiny given to those reasons to see whether they were pretexts. And, in fact, the trial judge did say, well, he wanted to look at his notes, he accepted the prosecutor's explanation. So the burden had shifted back already. And yet the court of appeals decision doesn't, it's almost like they didn't read the transcript of what had actually occurred at the trial. Your Honor, the people would certainly be the first, or the warden would certainly be the first to admit that there were errors made in this case. And I personally regret that the prosecutor made his statements there without thinking much. For example, when he talked about Mr. Cambridge giving few answers and couldn't articulate his opinions, I couldn't really tell if he was saying that Mr. Cambridge was evasive or if he was saying that Mr. Cambridge was mentally deficient in some way. You know, I read the transcript of the voir dire of Mr. Cambridge. Mr. Cambridge was pretty sharp. Well, again. I mean, at one point he says both, because the prosecutor is asking a very inartful question. And he was quite right to say both, because that's the way the prosecutor asked the question. But it was preposterous, because the prosecutor had simply misspoken. Then the prosecutor goes back and corrects himself. I mean, Cambridge is, he's no dummy. Well, it could also, I read the transcript, too, and I was not there at trial, as Judge Reback was and Mr. Greenwood was. And I guess the first impression I got was that Cambridge was perhaps being evasive. Evasive? Where was he evasive? I read the transcript. Where was he evasive? He was evasive in not clearly stating what, to me, I didn't think, or excuse me, I didn't, I think that it could be interpreted based on his body language when he was answering the questions. The body language that neither you nor I saw. That neither of us saw. That's what I say. Some people answer questions very slowly and hesitantly. Some people answer questions sort of looking around the room as to whether they really do. Wait a minute. Let's back up just a minute. You said I read the transcript and it seemed to me that it was evasive. Yes. But now you're talking about things that neither you nor I saw that could have persuaded the trial judge that he was evasive. Why did you think, reading the transcript, that he was evasive? I think it wasn't clear what, how he felt on the death penalty. And this was a death penalty case. I think it was not clear if Mr. Cambridge would actually agree to give the death penalty in the appropriate case. Well, I saw him, or as I read it, he was saying, you know, this is a hard question. I need to think about this. That's not evasive. That is, that's a hard question and I need to think about it. I mean, many people have exactly that response. Many people do. And, again, because many people have that response and many people aren't faced with that question in the everyday world, but I still think that is a reason why we need to defer to the findings of the trial court who knows Mr. Greenwood, the DDA, who has seen Mr. Greenwood in other contexts and has seen and sees the jury there before him and sees the, again, the things we can't see from the transcript, the things we can't pick up. What do we do with the fact when the trial judge afterwards, I mean, he doesn't rule right away, but just before beginning of the trial he does rule, the trial judge advances his own reasons as to why these were not discriminatory. He doesn't talk about the prosecutor's reasons. Well, you know, again, if we could concentrate on Mr. Cambridge, I think it was really interesting that the prosecutor said, I wouldn't have taken him under any circumstance. So there was clearly something about Mr. Cambridge that the prosecutor didn't like, whereas the judge said, the trial judge said, I thought it was a much harder case as to Mr. Cambridge. I couldn't really tell, you know, it was harder to tell there. But if you really look carefully at what the judge said, excuse me for pointing you around, I'm very sorry. That's all right. Or for suggesting that I haven't quite looked carefully. No, no. Well, excuse me for that, too, because I know it's clear that you read the trial transcript carefully, as I have, too, as I know we all have here. But Mr. — excuse me. Now I've lost my train of thought. But if you look at what the trial judge said, the trial judge actually refers back to what the prosecutor stated in court. The trial judge actually says, I didn't look at Mr. Cambridge's questionnaire, but you said that he didn't answer the questions fully. And so, in fact, I think, you know, as with many things, the trial judge did not necessarily disregard what — and I don't think we could assume that the trial judge disregarded what the prosecutor said. I think that the trial judge did go back and look at the questionnaire for Mr. Henderson, but he specifically states that he didn't look at the questionnaire for Mr. Cambridge. So he didn't do his own question. But my point is, what bothers me is that the district judge — excuse me, the superior court judge in disallowing the Batson challenge doesn't say, here are the reasons you gave, and it seems to me they're nonprotectional. Rather, he says, here are the reasons I think that he was a witness that you could properly have struck. And those were not the prosecutor's reasons. Well, again, that goes to Mr. Henderson more than to Mr. Cambridge, because for Mr. Cambridge, the trial judge did say, I thought it was a harder case as to Mr. Cambridge. I didn't read Mr. Cambridge's questionnaire, but you said that he didn't answer the questions correctly. In terms of Mr. Henderson, he did point — and again, here's where I wish that the prosecutor hadn't been so quick to provide his reasons, because the prosecutor provided the reasons of the drug and alcohol issues. But if you look at the voir dire, Henderson did have problems with law enforcement, did have an unfortunate experience with law enforcement, which, again, is a trigger to prosecutors who are looking for jurors who are biased in favor of the death penalty, frankly. But if we do a comparative analysis, some of the jurors who were sat had unfortunate experiences with law enforcement. People do. And, Your Honor, again — Well, not people do. Others who were seated did. Well, who were seated. There was only one other juror who was seated. I really have to contend that you can't compare the jurors who were not stricken by the prosecutor, because we really don't know if the prosecutor would have stricken them if they had been put in the box, come up there for trial and put in the box and not been stricken by the defense, because the prosecutor did not pass on his peremptories. The prosecutor kept using all his peremptories until the 12 were seated. So I think you really can't compare it to the people who were not stricken by — or, excuse me, who were not seated, because we just don't know what the prosecutor would have done with them. Well, as you, I think, mentioned, Cambridge was stricken because of his doubts about the death penalty. Wasn't that the whole reason? My reading of the transcript is that the prosecutor was concerned that Cambridge would not be a strong death penalty proponent, and that was his concern, was that Cambridge would not find for the death penalty, which in a death penalty trial is, frankly, what the prosecutors are looking for, is people who are pro-prosecution, pro-death penalty, pro-law enforcement. I have to say what troubles me about this case. The thrust of my question is, of course, to point out all the weaknesses I see in your case. That doesn't mean I'm going to end up ruling against you, but what troubles me about this case is that where we have a death case and we have two male African-Americans, both of them disqualified, and the prosecutor is sloppy, the trial judge is sloppy. I mean, this is a miserable excuse for a case. I certainly will agree that errors were made along the way. You know, in this case, Mr. Watkins did not get the death penalty, so to the extent that I know it doesn't mitigate sloppiness. But what was his ultimate sentence? Life without the possibility of parole. He was found guilty of first-degree murder with the special circumstances of robbery and burglary. And also in elder abuse, I believe. So, again, Your Honor, I agree that there were procedural errors here. It was sloppy. One would hope for more, especially in a death penalty case, or in all cases, actually. The prosecutors and the judge should be more full on the record. But I just don't think that the procedural errors here don't entitle Mr. Watkins to a new trial if he cannot demonstrate that there was an actual violation of the Constitution of purposeful racial discrimination by the prosecutor. And here, there just is, I think, on habeas, on appeal, on collateral review, it's just not really, he's not entitled to a new trial unless there's some showing of a violation of the Constitution by the fact that the prosecutor did something wrong. And if the Court has no further questions. Thank you, counsel. I believe we have time. Just to respond briefly. At page 16 of the excerpts of record, volume 2, Cambridge has asked, would you consider death? And I think we can get demeanor from words here, even though we didn't see it. He says, yes, I would, I would, I would. So he's making sure that the prosecutor hears him and is listening to him and doesn't cut him off. He says, yes, I would, I would, I would, three times. Well, maybe you said, yes, I would, I would. Yeah, we don't know. But he also said in his questionnaire, I think it has to be well thought out and educated. I think that's what we all want in a death penalty case. Or in any case, we want the jurors to think about it and make their decision an And the analysis. Yeah, well, that's a complicated response. Don't you think the prosecutor has some discretion in how he interprets it? I mean, you may interpret it differently, but I don't see this. Right. His reason for kicking juror Cambridge was his lack of ability to articulate anything regarding opinions. And I think the record demonstrably demonstrates that that's not true. Cambridge gave very thoughtful answers to the question. Well, the issue here is whether he was kicked out because of his race. Yes, sir. And I see my time is up. Thank you. All right. Thank you very much. Counsel Watkins versus small is submitted.
judges: Cudahy, Wardlaw, Fletcher W.